Katherine MacFayden, Executrix *v.* Charles A. Paul

———

KATHERINE MACFAYDEN, EXECUTRIX, *vs.* CHARLES A. PAUL.

Third Judicial District, New Haven, January Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and HAINES, Js.

The law will not raise an implied promise to pay for services rendered or materials furnished, unless the surrounding circum-

MacFayden *v.* Paul

stances reasonably indicate that the recipient expected, and was expected, to pay for them.

Proof that the plaintiff's intestate furnished wooden forms for the construction of a concrete cellar wall in the defendant's dwelling-house and carried the account upon his books under the defendant's name, was not sufficient to support a verdict for the plaintiff to recover their reasonable value, where such inferences as might be drawn from these facts were convincingly and overwhelmingly rebutted by the defendant's evidence to the effect that the work was done without expectation of reimbursement as a favor to the defendant, and solely under an arrangement between the decedent and the general contractor, who had entire charge of the erection of the house.

A charge contained in an account-book is prima facie evidence of a sale and delivery to the person charged, but it is always subject to explanation and contradiction.

The mere preparation of a bill from an account-book does not show an intention to make a charge against the person named therein, unless the bill is actually presented to him.

A casual estimate by a contractor of the value of work, neither made nor acted upon in the course of bargaining, cannot affect the amount of the recovery in an action for its reasonable value.

Argued January 20th—decided April 3d, 1925.

ACTION to recover the reasonable value of materials furnished and services rendered in the construction of the defendant's dwelling-house, brought to the Superior Court in Fairfield County and tried to the jury before *Maltbie, J.;* verdict for the plaintiff for $1,216, which the trial court, upon the defendant's motion, set aside as against the evidence, and from this decision the plaintiff appealed; and defendant filed a bill of exceptions under §5841 of the General Statutes. *No error.*

*Theodore E. Steiber,* for the appellant (plaintiff).

*Carl Foster,* for the appellee (defendant).

KEELER, J. The complaint alleges that plaintiff's testator, Malcolm MacFayden, rendered services and

furnished materials to defendant for the sum of $959.33, on or about October 24th, 1919; that the testator died March 31st, 1923, and plaintiff was the duly qualified executrix of his will; that the above sum has not been paid. It appears from a bill of particulars filed in the action that the claimed indebtedness was for services and materials furnished in constructing the cellar walls of a house belonging to defendant. All of the allegations of the complaint are put in issue by the answer. Plaintiff had a verdict for $1,216.45, being the amount claimed in the complaint with interest. This verdict was set aside by the court as against the evidence in the case. The defendant filed a bill of exceptions addressed to parts of the charge, which was allowed, and the claims therein contained were discussed in brief and on argument.

It is a conceded fact in the case that Paul engaged in the construction of a house with the firm of Casey & Hurley as general contractors. The contract is a part of the appeal record, as is also the paragraph of the specifications relating to the foundation, which was to be of stone laid in cement mortar. In place of a stone foundation there was actually constructed a cement concrete foundation. The plaintiff claimed on the trial that there was an implied contract on the part of defendant, to pay MacFayden for this construction. This claim was contested by defendant, and the issue so arising is the main issue in the case. The trial judge set the verdict aside on the ground that the jury could not reasonably have found that there existed in the case any facts from which an implied contract might arise.

The plaintiff produced as a witness John S. MacDougall, who testified that he was in the insurance business, but also did a great deal for MacFayden in the conduct of his business and, among other things,

did his bookkeeping. There was introduced in connection with his testimony a book containing detailed entries of work and materials furnished to certain jobs, made up of items, so far as the materials were concerned, from delivery tickets handed him which, once a month, he entered in the book, after checking them with the detailed monthly bills of those furnishing materials, and identifying the various jobs to which the materials went with the assistance of MacFayden or the one who had charge of the job. To the items of materials there were added the items for labor. The page alleged to contain the account with the defendant is headed "Mr. Paul," and contains detailed items for materials amounting in the whole to $502.10, for 12½% commission on the materials the sum of $62.76, and for labor $494.47. There is a credit of $100 for used lumber sold, leaving a balance due of $959.33. The account begins with the date October 24th, 1919, and contains entries as late as November 20th, 1919. The book in evidence contains accounts in many instances designating only the job, and not the person or corporation owning the property upon which the services were performed and materials furnished, such as "City Hall," "County Home," "County Court House," "Engine House," "Atlas Hotel," "Hotel Alpine." In other instances the name of an individual appears. The witness testified that as regards the headings designative of the building where any work was performed, when the bill therefor was made out by him it was made out to those who were responsible for payment. In many instances at the foot of an account of the kind described, there was added the word "paid" in ink, while the greater part of the entries in the accounts are in pencil. Witness testified that he made out bills from this book and usually sent them to the proper parties. In the case of the Paul

job, he made out the bill and gave it to MacFayden. No evidence appears with regard to other books of account kept by or for MacFayden. The slips or tickets pertaining to materials, after they had served their purpose of identifying the items in the monthly accounts, were not preserved for any extended time. None of them were produced at the trial. The lumber and other materials and the labor in connection therewith was used in making forms into which concrete was introduced by the general contractors, Casey & Hurley. Upon this testimony, together with formal evidence establishing her representative capacity and her testimony that MacDougall took care of her husband's books, the plaintiff rested her case.

The defendant testified that he had never employed MacFayden to do any work in the construction of his house, and that after the contract was let to Casey & Hurley, he never had any conversation with Mac-Fayden relative to his doing any of the work, and that the latter never presented any bill to the defendant, nor had he heard that MacFayden had any claim against him until after the former's death, when he was informed of such a claim by the attorney for the plaintiff and payment was demanded; that he owed nothing to MacFayden or his estate, and had paid Casey & Hurley in full for erecting the house; that when he saw that Casey & Hurley had not gone on building a stone foundation and were starting in to put up forms for a concrete foundation, he inquired as to the reason and was informed that the concrete work would be done without additional charge; that he inquired if the concrete work would cost less, since he had found out before he started building that a concrete foundation would cost $500 more than one of stone, and had cut it out and that was the reason why a stone foundation appeared in the specification. He

put the question to Mr. Hurley: "What are you making this change for? It is not agreed to." "Well," he said, "it isn't going to cost you anything." He testified that he never asked anyone concerned with the building to have the change made; also, that he never saw MacFayden on the job, although he occasionally went to the house to see how its erection was progressing; that at first he did not know that MacFayden was doing the work on the foundation, although afterward he was told; that Hurley told him that the cement work would be put in without cost to him; he did not tell him MacFayden was to do it without pay. The defendant also testified that he was the manager of the United Illuminating Company at Bridgeport, for whom Casey & Hurley and MacFayden had done considerable construction work, which, however, was not in defendant's charge, but was handled by the office of the company at New Haven.

Robert E. Hurley testified that he was a member of the firm of Casey & Hurley, and built the house for the defendant under a written contract; that the construction of the cellar wall was changed to concrete and MacFayden had lumber for forms taken to the ground, and one day, just after the latter had left, the defendant came there and wanted to know what they were going to do, and he told him: "MacFayden is going to put in the forms, and we are going to give you a cement foundation for your house." Witness knew Paul would like this because he originally had a figure on cement foundation in the estimates, and threw it out because it cost too much; that there was nothing ever said at the time that the lumber was taken to the job about any additional price for the concrete work, and none was ever paid on that behalf. On cross-examination Mr. Hurley was asked how it came about that MacFayden did the job and he replied as follows: "Mr.

MacFayden was working for us at the time down on the Congress St. station of the United Illuminating Co., and we were talking one day about—we felt it was kind of bad that Charlie Paul didn't have a concrete foundation instead of stone. Mr. MacFayden brought me out in the yard and said, 'Let's go out in the yard.' He had an immense pile of old forms taken from work in the station there, and he said, 'On account of them I can put up those forms for you and it will only cost me the labor, the lumber can be used.' So I said— he wanted to know then if I could pour cement in the foundation as cheap as I could build stone—I said I could, I would be satisfied to do it if he would build the forms. He said it wouldn't cost much to furnish the labor, he had all the lumber there, and he went ahead and started right there. We had an understanding about the matter and he went ahead with the forms. . . . The understanding was—he was doing a lot of work for me at the time, for Casey & Hurley, and the amount of money for the labor would be so small that he wouldn't mind, that he would work it out in some other way. That was the understanding." Also that he had never paid MacFayden anything directly applying on this work, nor ever agreed to do so, and never had a bill for this work, although he had had an account with him which, after some disagreement, he had settled and taken from him a receipt in full; that the furnishing and placing of the concrete, since the forms were furnished by MacFayden, was substantially equivalent to the cost of laying up the foundation in stone. Asked whether MacFayden was doing this work for Casey & Hurley, or for Paul, he answered: "Doing it for Casey & Hurley. Mr. Mac-Fayden was working for us at the time and he did— Mr. MacFayden did hundreds of thousands of dollars worth of United Illuminating Co. work through us.

He did very little work through the United Illuminating Co., he was doing it through us." When asked why MacFayden should do this work for nothing, Hurley said that he could not tell, but that he had a suspicion that he did not care to state. This line of inquiry was not pursued further.

In sustaining his claim that from the testimony the jury might properly have found an implied contract on the part of Paul to pay MacFayden for the work, plaintiff urges the following claims: That there was a book account covering certain items charged, an admission by defendant that the work was done, and that the work benefited him, and an account of credits which would not have appeared had there been no expectation of payment. Now there is no evidence in the case that Paul knew of any claim made by Mac-Fayden, knew of any account, or of any credits thereon. It is true that the evidence showed that the work was done and that it was beneficial to him in that he got a concrete wall, a better wall, for the price of a stone wall. But plaintiff is invoking the principle that where a person sees a valuable service rendered to him under circumstances implying that payment therefor is expected and allows it to proceed, there is implied a contract on his part to pay for the service what it is reasonably worth. But in the instant case all the evidence bearing on this point negatives the conclusion that from his conduct anything can be implied looking toward payment for a benefit received. He noticed the change in the construction, and he inquired the reason for it, and he knew that the change involved extra expense; but he was informed that there would be no extra charge for the change, informed by a member of the contracting firm to which his payments were to be made. If this be so, he was not charged with any knowledge of how MacFayden came to do

the work, and had a right to suppose it was alto-
gether a matter between the latter and Casey & Hurley.
There is no evidence in the case from which any con-
duct on the part of the defendant appears, which
would imply the slightest recognition of the relation
of debtor and creditor between him and MacFayden.
He had an entire contract for the whole work with
Casey & Hurley, for a fixed and definite price, and
for that only could he be holden.

The book introduced in evidence was admissible,
but an examination of it reveals that it is primarily a
classification and designation of jobs, and while it may
have been of use in making out bills, it is hardly the
sort of book which, unassisted by other testimony, is
prima facie evidence of services or materials furnished
to a defendant. As sustaining evidence, the plaintiff
urges the fact of the preparation of a bill charging
defendant with the items appearing in the book. In
the book introduced in evidence there are confessedly
a considerable number of accounts headed with desig-
nations of the locality of work performed; there are
others headed with the names of persons. The court
evidently admitted the evidence contained in the book
as constituting prima facie proof of a charge to Paul in
case the heading "Mr. Paul" should be found by the
jury as not merely designative of the job, but as
charging the items to the defendant. If the jury so
found, then the charge upon the book was prima facie
evidence of a sale and delivery of goods, and also of
a sale to the defendant. *Plumb* v. *Curtis*, 66 Conn. 154,
162, 33 Atl. 998. But this evidence, in its nature prima
facie, was subject to explanation and contradiction,
and the evidence adduced by defendant was powerful
and adequate to explain and contradict fully any con-
clusion to be drawn from the items appearing in the
book, and from the fact that a bill was made out and

taken by MacFayden, and not sent by MacDougall to Paul. The trial judge in his memorandum of decision rightly says that "the issuance of the bill is of no consequence in view of the fact that it was given to the deceased instead of being sent to the defendant and the latter expressly and firmly denies its receipt." It may be added that if having the bill made out indicated an intent to charge defendant for the work, the fact that MacFayden took it and so far as it appears in plaintiff's case (leaving out of consideration for the moment Paul's denial of ever receiving it) never rendered it to Paul, is as much indicative of no intention of rendering it, or claiming an indebtedness against the latter. In order to find for the plaintiff, the jury practically had to disregard all of the defendant's testimony. If the jury had considered the plaintiff's evidence without the evidence afterward adduced by defendant, it might perhaps have been very much at loss to determine why MacFayden had done so much work and furnished so much material for nothing, but certainly a very convincing explanation was furnished by the defense, in that defendant offered testimony by himself and his contractor that he let a contract for building a house for an agreed price, that his house was built and that he paid the contractor for it. The change in the construction of the cellar wall is explained quite acceptably by Hurley's testimony, when the large amount of work done for the large corporation by Casey & Hurley is considered, in which MacFayden had profited by subcontracts, and also that he had done work for the corporation directly. It makes little difference whether the concrete work done on the cellar was to be gratuitous and by way of compliment on the part of MacFayden and Casey & Hurley in combination, or by the former alone. Unless defendant's testimony and that of Hurley is to be en-

tirely disregarded, the fact stands out that defendant neither expected nor agreed to pay for it. The situation strongly suggests an appreciation of past favors and a lively sense of those to come. A review of the whole testimony leads to the inevitable conclusion that the conclusions reached by the jury were not such as reasonable minds could reasonably have reached, and it clearly appears that it disregarded the rules of law applicable to the case. The legal discretion of the judge in setting aside the verdict was properly exercised. There is no error on plaintiff's appeal.

The questions arising on defendant's bill of exceptions do not require extended discussion. The court charged the jury: "Now there is no question here made that these materials were furnished and these services were performed. There is no question that they went to the benefit of the defendant." Defendant challenges the correctness of the last sentence just quoted, saying that therein lies the sole issue in the case; that if the benefit accrued to Paul, he should pay the bill; that if it accrued to Casey & Hurley, they should pay. There is a sense in which this may be true, but as a generalization covering the entire case, defendant's counsel is conceding too much. It is quite evident that the court was using the word benefit in its ordinary significance, that of a material advantage, and not in any technical sense as a factor in an implied contract. The plaintiff certainly did derive benefit from getting a cellar worth $500 more than the sum called for in the contract. Taken in connection with the whole charge as the same appears in the record, no harm could possibly have come to defendant by this sentence in the charge.

The court charged that the book admitted in evidence was admissible as tending to show the existence of a contract. Defendant claims that the book itself,

and the evidence given by MacDougall in connection therewith, plus all the evidence adduced by defendant did not make out a prima facie case, and that, therefore, the jury should have been told that it should not consider the book at all, since as a final result of the evidence, the book had no evidential weight. This is fallacious; the book was entitled to be admitted in evidence and considered, for what it was worth, both for the purpose of proving a sale and delivery and to prove a sale to defendant. *Plumb* v. *Curtis*, 66 Conn. 154, 162, 33 Atl. 998. Its weight was a question for the jury, and in the charge the court intimated to the jury that the book might have little weight as evidence, but was in the case and an element for their consideration. Further than that the court could not go, unless it had directed a verdict for defendant, which it was not asked to do. The trial court in its original charge did not instruct the jury upon the question of damages, but afterward, at the request of the jury, charged that if it found a verdict for plaintiff it should be for the amount of the bill of particulars with interest. This instruction is correct.

The defendant claims that the attention of the jury should also have been directed to the testimony of Hurley, wherein he said, "I did not owe him $993 anyway, because Mr. MacFayden said it would only cost about $200 or $250 at the most for labor." The only value of this remark was by way of admission by the deceased of a less value than that charged. This remark made in conversation to Hurley was not for the purpose of giving the latter an approximate figure on which he might place some reliance in making his calculations, for by all of Hurley's testimony, it appears that he did not expect to pay MacFayden anything. The mention of the value of the labor was casual conversation, explanatory of MacFayden's willingness to

do certain work gratuitously. It was not given to be acted on by way of bargaining. There is nothing erroneous in any of the exceptions, when taken in connection with the charge as a whole.

There is no error on plaintiff's appeal, and none is apparent in defendant's bill of exceptions.

In this opinion the other judges concurred.